IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANTAVIONE FERGUSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:22-cv-607-ECM |
| | ) | [WO] |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

Antavione Ferguson ("Ferguson"), a black police lieutenant in the Montgomery Police Department ("MPD"), was terminated in October 2020 after he deployed a carotid submission hold[1] to apprehend a felony suspect. Ferguson subsequently filed suit against the City of Montgomery ("the City") and Montgomery Mayor Steven Reed ("Reed") (collectively, "the Defendants"), asserting violations of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I) and the Fourteenth Amendment's Substantive Due Process Clause, pursuant to 42 U.S.C. § 1983 (Counts II and III). (Doc. 1).[2]

---

[1] The parties refer to Ferguson's use of force differently. Ferguson labels his use of force as a "submission hold" (doc. 37-1 at 39:12), "carotid submission hold" (doc. 1 at 4, para. 19), or "'blood' choke hold" (doc. 40 at 2). The City styles Ferguson's use of force as a "chokehold maneuver" (doc. 38 at 1) or "chokehold" (doc. 37-1 at 39:9–10). For purposes of this Opinion, the Court will use "carotid submission hold" to describe Ferguson's use of force. This choice is purely stylistic and did not factor into the Court's decision in this case.

[2] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

On May 19, 2023, this Court dismissed Counts II and III against the City and Counts I, II, and III against Reed. (Doc. 22).  The City, the only remaining Defendant in this action, now seeks summary judgment on Ferguson's two remaining claims—race discrimination and retaliation in violation of Title VII (Count I). (Doc. 36).  The City's motion for summary judgment is fully briefed and ripe for review.  Based on a thorough review of the record, the briefs, the applicable law, and for the reasons that follow, the motion is due to be GRANTED.[3]

## II.  JURISDICTION

The Court has original subject matter jurisdiction in this proceeding pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

---

[3] Ferguson's summary judgment response is deficient in multiple respects. (*See generally* doc. 40).  First, Ferguson largely fails to comply with this Court's directive regarding dispositive motions.  "In all briefs filed by any party relating to the motion, the discussion of the evidence in the brief must be accompanied by a *specific* reference, by page and line, to where the evidence can be found in a supporting deposition or document.  Failure to make such specific reference may result in the evidence not being considered by the court." (Doc. 28 at 2, Section 2) (emphasis added).  Second, Ferguson fails to meaningfully respond to several of the City's arguments.  This Court is not under a duty to exercise imagination or conjure what a party might have argued but did not argue; nor is this Court obliged to do Ferguson's (or his counsel's) work. *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . .").  Despite the fact that this Court is under no obligation to dig through the record evidence without any meaningful guidance or analysis from the Plaintiff, the Court did so here.  The Court's own analysis reveals that the City is entitled to summary judgment.

*Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)). "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* at 1311. The burden then shifts to the nonmoving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Nonmovants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory

answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.   Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.*   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV. FACTS[4]

Ferguson, a black male, served the MPD as a police officer from 2004 until his termination in 2020.   Ferguson rose through the MPD ranks and eventually obtained the rank of lieutenant.[5]   On June 30, 2020, Ferguson deployed a carotid submission hold to effectuate a suspect's arrest.   While subdued by the carotid submission hold, the suspect stated that he could not breathe, which Ferguson does not contest. (Doc. 37-1 at 39:16–20). Following the suspect's arrest, Ferguson verbally reported the incident to his immediate

---

[4] Because this case comes before the Court on the City's motion for summary judgment, the Court construes the facts in the light most favorable to Ferguson, the nonmovant. The Court draws all justifiable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[5] Ferguson was promoted to lieutenant in approximately 2017–2018. (Doc. 37-1 at 31:19–21).   Ferguson served as a MPD lieutenant when he deployed the June 30, 2020 carotid submission hold to effectuate a suspect's arrest. (Doc. 37-5 at 227:3–5).

supervisor,[6] Captain D.K. Corkran ("Corkran").[7] (*Id.* at 67:13–17). Although he verbally reported the incident to Corkran, Ferguson did not document the incident in writing and failed to complete a MPD "Defensive Action Form." (*Id.* at 39:21–40:1).

During the June 30, 2020 incident, the suspect damaged a MPD vehicle. (*Id.* at 45:22–46:1). Deputy Chief of Operations, Jennifer M. Reaves ("Reaves") reviewed body camera footage to assess the damaged MPD vehicle. (*Id.* at 46:2–6). During Reaves' review of the body camera footage, she observed Ferguson deploy a carotid submission hold to effectuate the suspect's arrest. (*See* docs. 37-3 at 18, 37-5 at 94:8–22). Reaves forwarded the footage to City Investigations, which subsequently initiated a review of Ferguson's conduct. (*See* docs. 37-3 at 18, 37-5 at 95:2–3). Reaves independently reviewed the incident and on August 10, 2020, informed her direct supervisor, Ernest N. Finley, Jr. ("Finley"), Chief of Police, that Ferguson violated MPD's Use of Force Written Directive, Policy 3.4.1 ("MPD Directive 3.4.1") "by utilizing a choke hold to gain compliance during the arrest of a subject." (Doc. 37-3 at 14). Reaves later reviewed City Investigations' case file and determined that Ferguson also failed to properly "notify or document" his use of force. (*Id.* at 18). Reaves found Ferguson deployed "[a] substantiated Use of Force [by] utilizing a choke hold [which] is considered a Major Violation." (*Id.*). On August 11, 2020, Reaves informed Finley that Ferguson's conduct warranted a twenty-calendar day suspension. (*Id.*). Reaves' and Ferguson's relationship—before, during, and

---

[6] The MPD's rank and command structure, listed in descending order of authority, is as follows: Chief, Deputy Chief, Major, Captain, Lieutenant, and Sergeant. (Doc. 37-3 at 2, para. 1).

[7] Ferguson's deposition transcript incorrectly refers to Captain D.K. Corkran as "Captain Cochran." (*See, e.g.*, doc. 37-1 at 66:15).

after the June 30, 2020 incident—led to Ferguson allegedly informally complaining to superiors and filing a workplace harassment complaint against Reaves in September 2020. (*See* docs. 37-2 at 2, 40 at 9).

On August 26, 2020, Ferguson met with Finley to "discuss the disciplinary action of his case." (Doc. 37-3 at 13).  On August 31, 2020, Finley informed Reed that he upheld Reaves' recommendation of a twenty-calendar day suspension. (*Id.*).  Ferguson appealed Finley's decision to uphold his twenty-calendar day suspension. (Doc. 37-1 at 52:15–17). On October 2, 2020, presumably during Ferguson's appeal of his twenty-calendar day suspension, an investigation began into allegations that Ferguson and twelve other MPD officers worked as off-duty police officers without MPD approval. (Doc. 37-2 at 2). Ferguson was informed of the investigation on October 3, 2020—during his appeal process.[8] (Doc. 37-3 at 20).  Further, as part of Ferguson's appeal, Reed appointed retired Judge Charles Price ("Judge Price") to conduct a hearing regarding Ferguson's discipline. (*See* docs. 37-1 at 53:1–13, 37-4 at 11:7–14).  Judge Price recommended Ferguson serve a twenty-calendar day suspension.[9] (*See* doc. 37-4 at 12:1–6).  Reed disagreed with Judge Price's recommendation of a suspension and later terminated Ferguson. (Doc. 37-3 at 9). Reed terminated Ferguson because he violated the MPD's 2016 Use of Force

---

[8] Ferguson concedes that the investigation into off-duty police officers was not completed before he was terminated. (Doc. 37-1 at 122:9–14).

[9] Ferguson disputes the characterization of his recommended suspension.  Ferguson states that his suspension recommendation was "changed . . . from 20 days suspension at headquarters, which is working days, to 20 calendar days suspension at the Judge Price [hearing]." (Doc. 37-5 at 244:22–245:2).  The City's evidence shows that Reaves' initial recommended suspension was "20 calendar days." (Doc. 37-3 at 18). The Court will assume without deciding that Ferguson's initial and final suspension recommendations by Reaves and Judge Price were for twenty-calendar days.

Memorandum which stated, "substantiated Use of Force cases involving any form of *choking* of a subject will be considered a major violation and will result in disciplinary action up to and including *termination*." (Doc. 37-1 at 141) (emphasis added). Reed labeled this 2016 Use of Force Memorandum as a "zero[-]tolerance policy against choking." (Doc. 37-5 at 36:8–9). Ferguson's MPD employment ended on October 20, 2020. (Doc. 37-3 at 8).

On April 16, 2021—nearly six months after his termination—Ferguson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he was "discriminated against due to [his] race and retaliated against for asserting [his] rights in violation of Title VII." (Doc. 1-2 at 2).

## V. DISCUSSION

### A.    Unlawful Discrimination

The Court first turns to Ferguson's claim that the City violated Title VII by unlawfully terminating him because of his race. Ferguson can survive summary judgment by putting forward "enough evidence for a reasonable jury to conclude that illegal discrimination occurred." *McCreight v. AuburnBank*, 117 F.4th 1322, 1326 (11th Cir. Sept. 19, 2024). Ferguson can meet this burden by making a prima facie case of unlawful discrimination under the *McDonnell Douglas* framework or by showing a convincing mosaic[10] of evidence to allow a reasonable jury to find unlawful discrimination.

---

[10] The Eleventh Circuit in *McCreight*, stated "to the extent the term 'convincing mosaic' has become a distraction, we again reiterate that this 'approach to analyzing the evidence treats an employment discrimination suit in the same way we would treat any other case—jumping directly to the question of liability and deciding whether the moving party is entitled to judgment at that stage of the case." *McCreight*,

1.    *McDonell Douglas* **Analysis**

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a).

Because Ferguson does not present direct evidence of racial discrimination, but instead relies on circumstantial evidence, the Court will evaluate his claim under the *McDonnell Douglas* framework.  Under the *McDonnell Douglas* framework, Ferguson bears the initial burden of establishing a prima facie case of racial discrimination by showing:  (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) the City treated similarly-situated employees outside of his protected class more favorably. *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1336 (11th Cir. May 1, 2024); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If Ferguson succeeds in making out a prima facie case, the burden shifts to the City to articulate legitimate, nondiscriminatory reasons for its actions. *Poer*, 100 F.4th at 1336 (citations omitted).  If the City articulates legitimate, nondiscriminatory reasons for its actions, the burden shifts back to Ferguson to "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Id.* (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)).  The asserted reason cannot be pretext "unless it is shown *both* that the reason was

---

1 17 F.4th at 1335–36 (quoting *Tynes v. Fla. Dep't of Juv. Just.,* 88 F.4th 939, 947 (11th Cir. 2023)).  This Court uses the term "convincing mosaic" for stylistic purposes but acknowledges that a convincing mosaic "is a metaphor, not a legal test and not a framework." *Id.* at 1335 (quoting *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023)).

false, *and* that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original)).

The parties do not dispute that Ferguson belongs to a protected class, was qualified to perform as a MPD Lieutenant, and was subjected to an adverse employment action—his termination. Here, the parties disagree on the fourth prong of the *McDonnell Douglas* framework—whether the City treated similarly situated employees more favorably than Ferguson. To show that the City treated similarly situated non-black employees more favorably, Ferguson must present evidence of a comparator—someone who is "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019) ("*Lewis I*") (en banc). Ferguson's comparator evidence should demonstrate that "like" employees were treated "differently." *Id.* at 1223. Ferguson and his proposed comparators are not required to be identical. *Id.* at 1227. Instead, a similarly situated comparator and a plaintiff, like Ferguson will typically: (1) have engaged in the same basic conduct or misconduct; (2) be subject to the same employment policies; (3) have the same supervisors; and (4) share an employment or disciplinary history. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *Lewis I*, 918 F.3d at 1227–28).

### a.    Comparator Analysis

Ferguson identifies four "comparators" who he argues demonstrate that the City treated similarly situated white employees more favorably: Captain William E. Herman

("Herman"), Paul Harris ("Harris"), Corkran, and Major John W. Hall ("Hall").[11]   The

Court now turns to individually evaluate each of Ferguson's four proposed comparators.[12]

### i.    Captain William E. Herman

Ferguson identifies Herman, a white officer, as his first valid comparator.  Ferguson

claims that Herman "used a similar carotid submission hold on a handcuffed suspect and

received less days of suspension than [Ferguson] and was not terminated." (Doc. 1 at 5,

para. 23).  Ferguson correctly identifies one similarity—Herman and Ferguson engaged in

the same basic misconduct.  Like Ferguson, Herman restrained a suspect by the neck.  On

June 3, 2016, Herman used "profanity toward a citizen" and "*choked* an individual." (Doc.

37-3 at 49) (emphasis added).  The similarities between Ferguson and Herman end there.

Although he engaged in misconduct similar to Ferguson—Herman was *not* subject

to the same MPD policies.  Ferguson was subject to the 2016 Use of Force Memorandum,

which implemented a department policy that "substantiated Use of Force cases involving

any form of *choking* of a subject will be considered a major violation and will result in

---

[11] Ferguson's complaint only identifies Herman by name as a valid comparator. (Doc. 1 at 5–7).  Ferguson referenced Harris, Corkran, and Hall in his deposition (*see* doc. 37-1 at 59:4, 55:14–21) and summary judgment response (doc. 40 at 3, 7).

[12] Ferguson identified two other "comparators" during his deposition testimony.  First, Ferguson identified a black individual who purportedly worked at a "jail" and was involved in a "choking incident." (Doc. 37-1 at 64:13–65:13).  This individual was allegedly not punished for his use of force. (*Id.* at 65:11–13).  Second, Ferguson identified a black individual who was involved in a "choking incident" on "Ann Street." (*Id.* at 65:1–10).  This individual was also allegedly not punished for his use of force. (*Id.* at 65:11–13).  Ferguson did not recall either individuals' names, who served as their commanding officers, or whether any charges against them were substantiated. (*Id.* at 65:5–20).  Further, the record does not include evidence regarding the unnamed individuals' disciplinary histories, employment statuses, or whether they were MPD employees.  The record evidence, even when viewed in the light most favorable to Ferguson, does not show that the unnamed individuals were similarly situated and treated more favorably.  Thus, the unnamed individuals are not appropriate comparators, and Ferguson's evidence regarding them fails to support a prima facie case of intentional discrimination under the *McDonnell Douglas* framework.

disciplinary action up to and including *termination*." (Doc. 37-1 at 141) (emphasis added). This 2016 Use of Force Memorandum, which cautioned against uses of force involving "choking of a subject," became effective on July 26, 2016—approximately three weeks *after* Herman's conduct.[13]    Because Herman used a chokehold against a suspect, prior to the issuance of the 2016 Use of Force Memorandum—the policy could not have governed Herman's use of force.    Therefore, Ferguson's and Herman's conduct were governed by different MPD policies, which cuts against Herman serving as a valid comparator.

Herman and Ferguson had different supervisors.    Herman was not disciplined by Reed; instead, he was disciplined by Mayor Todd Strange ("Strange"), Reed's predecessor. The City claims "that interim decision makers and those recommending and/or considering [Herman's] punishment were also different." (Doc. 38 at 21–22).    Ferguson does not refute this claim.    The record evidence shows that Major J.M. Bowman ("Bowman") charged Herman with violations of "Article I: Section 1.401 – Human Relations (used profanity toward a citizen) and Article II: Section 2.205 – Duty in the Use of Force [placing a restrained suspect in a chokehold]." (Doc. 37-3 at 3, paras. 3, 49).    Chief of Staff C.A. Wingard ("Wingard") recommended that Herman serve a fifteen-working day suspension. (*Id.* at 3, para. 3).    Finley also recommended to Director of Public Safety, J. Christopher

---

[13] Ferguson contends that MPD Use of Force Policy 3.3.1 rescinded the 2016 Use of Force Memorandum effective July 12, 2019. (Doc. 37-1 at 43:9–44:10).    The record does not include a copy of MPD Use of Force Policy 3.3.1.    Even viewing the evidence in the light most favorable to Ferguson, such that his conduct was not governed by the 2016 Use of Force Memorandum, Herman and Ferguson would still be too dissimilar to be considered similarly situated in all material respects.    Because Herman's and Ferguson's disciplinary histories and supervisors were significantly different, and Ferguson does not allege that Herman failed to report his use of force, the two are not valid comparators for the purposes of establishing a prima facie case of discrimination under the *McDonnell Douglas* framework.

Murphy ("Murphy"), that Herman serve a fifteen-working day suspension. (*Id.*). Herman, like Ferguson, attended a hearing in front of Judge Price. (*Id.*). Although Finley and Judge Price participated in Ferguson's and Herman's disciplinary processes, the record reflects that Bowman, Wingard, Murphy, and Strange played no part in Ferguson's disciplinary proceedings. Herman's incident occurred nearly four years before Ferguson's June 30, 2020 conduct. Even if the intermediate decisionmakers were similar, two different mayors, Reed and Strange, delivered Ferguson's and Herman's final punishments.[14] *See e.g.*, *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"). Therefore, because Ferguson and Herman were punished by Reed and Strange respectively, this cautions against Herman serving as a valid comparator to Ferguson.

Finally, Herman and Ferguson do not share similar employment or disciplinary histories. Prior to his use of force in June 2016, Herman "had no other disciplinary actions or infractions in the 12-year period preceding this matter." (Doc. 37-3 at 3, para. 3). Unlike Herman, Ferguson has a lengthy history of disciplinary violations, with eleven MPD violations spanning over a fifteen-year period from 2005 through June 2020. (*See generally id.* at 7–47).

---

[14] The mayor serves as the City's ultimate decisionmaker and "shall have the authority to remove officers and employees of the city subject to the provisions of the merit system that might be in force at that time." Ala. Mun. Code § 4.06(2).

Ferguson's argument that Herman is a valid comparator paints with a broad brush and ignores "critical differences" between the two. *See Lewis I*, 918 F.3d at 1230. Ferguson and Herman were disciplined by different decisionmakers and share dissimilar disciplinary histories. Although they engaged in similar misconduct, Herman and Ferguson cannot be considered similar in all material respects because only Ferguson's conduct was expressly subject to the 2016 Use of Force Memorandum, which considered "choking of a subject . . . a major violation." (Doc. 37-1 at 141). Therefore, Ferguson's evidence regarding Herman fails to support his prima facie case of intentional discrimination under the *McDonnell Douglas* framework.

### ii.    Paul Harris

Next, Ferguson identifies Harris, a white officer, as a valid comparator. Ferguson claims that Harris was "investigated for misconduct and received a more favorable outcome th[a]n [Ferguson]." (Doc. 40 at 7). Ferguson alleges Harris "struck a man that was down on the ground in the face with a taser" at an unknown date, sometime "after" 2016. (Doc. 37-1 at 62:1–63:3). The City provides record evidence that Harris violated MPD Directive 3.3.1–Response to Resistance, "for striking a citizen with his elbow and taser during a struggle while arresting him on February 6, 2020." (Doc. 37-3 at 4, para. 4). Ferguson alleges that Harris was not terminated for his conduct and instead received a suspension of an unknown length. (*See* docs. 37-1 at 63:6–12, 40 at 3). The City provides evidence that Harris received a 160-hour suspension. (Doc. 37-3 at 4, para. 4). Although Ferguson has *identified* Harris as a comparator, he has failed to show Harris is similar in all material respects.

13

First, Ferguson and Harris did not engage in the same misconduct. Harris struck a suspect with his elbow and taser while effectuating an arrest. Ferguson deployed a carotid submission hold to subdue a suspect. Although Ferguson's and Harris' actions broadly involve alleged improper uses of force, their conduct is not sufficiently similar for the parties to be valid comparators. In *Lewis I*, a plaintiff argued that she and her comparators were similarly situated because the parties "were all placed on administrative leave by the City when they could not meet a physical qualification of the job of a police officer." *Lewis I*, 918 F.3d at 1229. Although both parties failed to meet the "physical qualifications" of their jobs generally, the Eleventh Circuit reasoned in part that because the plaintiff and her comparators suffered from "altogether different conditions"—they were not similarly situated. *Id.* at 1230–31. The parties were governed by different personnel policies and "placed on leave for different underlying conditions." *Id.* at 1231. Here, even if both parties allegedly used improper force, Ferguson and Harris deployed forces of different kinds and degrees—and were disciplined pursuant to different MPD policies. Thus, Ferguson's and Harris' alleged misconduct is too dissimilar for them to be considered similarly situated in all material respects.

Second, Ferguson provides no evidence that Harris was charged under similar MPD policies. Ferguson was charged with failure to report his use of force under MPD Directive 3.4.1. There is no record evidence to suggest that Harris was charged with violating any MPD policies for failure to report his use of force. *See Moore v. Ala. Dept. of Corr.*, 137 F. App'x 235, 239 (11th Cir. 2005) ("We have previously held that a difference in the

charged offenses can preclude a comparison for Title VII purposes.").[15]  Ferguson cursorily alleges that "Chief Ernest Finley actually admitted on the news that [Harris] acted outside of policy." (Doc. 37-1 at 62:5–7).  Ferguson does not allege which policy Harris violated, and Harris was charged with violating MPD Directive 3.3.1–Response to Resistance, rather than MPD Directive 3.4.1.  Additionally, because Harris did not deploy a carotid submission hold, he did not violate the 2016 Use of Force Memorandum which effectively outlawed "any form of choking." (*Id.* at 141).

Third, the record is unclear and does not reflect which decisionmakers disciplined Harris.  Ferguson claims that Finley "admitted on the news that [Harris] acted outside of policy." (*Id.* at 62:5–7).  Viewing the record evidence in the light most favorable to Ferguson, the Court assumes without deciding that Finley was one of Harris' supervisors.  Outside this brief reference to Finley, Ferguson fails to provide evidence of any other decisionmakers involved in Harris' discipline.  Ferguson provides no record evidence to identify who served as Harris' Sergeant, Lieutenant, Captain, Major, or Deputy Chief (*Id.* at 62:13–15).  Ferguson does not allege that the City's mayor ultimately disciplined Harris.  The record evidence does not suggest that Harris ultimately appealed his recommended discipline or that Reed ever reviewed his conduct.  During his deposition Ferguson claimed that "Steven Reed was [the Mayor]" during Harris' discipline. (*Id.* at 63:5).  Reed was elected to serve as the City's mayor in 2019, and if Harris appealed the MPD's 160-hour

---

[15] The Court here, and elsewhere in the Opinion, cites to non-binding authority.  While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

suspension—Reed likely disciplined Harris.[16]  Even viewing the record evidence in the light most favorable to Ferguson, he fails to identify the relevant decisionmakers with the requisite degree of specificity required to show he was similarly situated in all material respects to Harris.

Finally, Ferguson and Harris do not share a similar employment or disciplinary history.  Ferguson notes that Harris was "suspended twice" before the tasing incident. (*Id.* at 63:10–12).  The record provides no further details regarding Harris' disciplinary history other than the notion that Harris was previously suspended.  Ferguson does not allege why Harris was suspended, when he was suspended, or how long he was suspended. Surprisingly, the record does not provide Harris' rank or even suggest how long Harris was employed with the MPD.  Ferguson's complaint (doc. 1), summary judgment response (doc. 40), and deposition testimony (doc. 37-1) show that Harris and Ferguson are not sufficiently similar in all material respects.  Therefore, Ferguson's evidence regarding Harris fails to support his prima facie case of intentional discrimination under the *McDonnell Douglas* framework.

### iii.    Captain D.K. Corkran

Ferguson identifies Corkran, a white officer, as a third potential comparator. Ferguson claims that Corkran, his supervisor, was "investigated for misconduct and received a more favorable outcome th[a]n [Ferguson]." (Doc. 40 at 7).  City Investigations

---

[16] Mayor Steven L. Reed was sworn in as the Fifty-Seventh Mayor of the City of Montgomery, Alabama in November 2019.  *See Mayor Steven L. Reed*, City of Montgomery, Alabama, https://www.montgomeryal.gov/government/city-government/mayor-s-office/mayor-steven-reed.;  (*see also* doc. 37-4 at 17:19–22).

substantiated charges against Corkran for violating MPD "Policy 1.1.6 Failure to Notify CEO of Incident with Liability"—stemming from his failure to report Ferguson's use of force. (Doc. 37-3 at 4, para. 6). Corkran received a "Category A Step 1 discipline[,]" which he did not challenge. (*Id.*).

Corkran and Ferguson worked for MPD and failed to report a use of force to their superiors. Corkran's and Ferguson's similarities end there. First, Corkran failed to notify his superior officer regarding Ferguson's use of force. Ferguson verbally notified his supervisor but failed to complete a MPD Defensive Action Form. (Doc. 37-1 at 39:21–40:2). At first glance Corkran and Ferguson engaged in the same basic misconduct. However, this summary ignores the underlying reason why Corkran and Ferguson were required to comply with MPD reporting and paperwork policies—Ferguson deployed a carotid submission hold—which was against MPD policy. Ferguson does not allege that Corkran deployed a carotid submission hold and concedes that Corkran was not accused of using excessive force in the form of a carotid submission hold. (*Id.* at 56:9–12).

Second, Ferguson does not argue that Corkran was charged with violating the same employment policies. Corkran was disciplined under MPD Policy 1.1.6, whereas Ferguson was disciplined under MPD Directive 3.4.1 and the 2016 Use of Force Memorandum. *See Moore*, 137 F. App'x at 239 ("We have previously held that a difference in the charged offenses can preclude a comparison for Title VII purposes."). Although the difference in rank between Ferguson and Corkran is not "dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim," it is important to note that Ferguson and Corkran held different ranks at the time of their respective disciplinary

consequences. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008); *c.f.*, *Anthony v. Georgia*, 69 F.4th 796, 805 (11th Cir. 2023) (noting that two police officers were not similarly situated in all material respects, in part because they held different ranks).

Third, the record is unclear and does not state which individuals disciplined Corkran. The record evidence suggests that Corkran did not contest his disciplinary result, and therefore did not exhaust his appeal rights. (Doc. 37-3 at 4, para. 6). Because the record evidence does not suggest that Reed disciplined Corkran, and Ferguson fails to meet the burden of production at this stage in the proceedings—Ferguson's and Corkran's disciplinary processes were not similar in all material respects.

Fourth, Ferguson and Corkran do not share employment or disciplinary histories that are similar in all material respects. Ferguson points to no record evidence of Corkran's employment or disciplinary history, which is only buried within the City's summary judgment evidence. Corkran testified at a City personnel board hearing that he missed a court appearance, failed to attend a "continuing education class[,]" was involved in four "City vehicle accidents[,]" failed "a pistol qualification[,]" was charged with "malingering[,]"[17] and served a four-day suspension for "conduct that reflected negatively on the Department . . . in 2013." (Doc. 37-5 at 178:11–22). The record does not explain why Corkran served the four-day suspension or provide any additional insight into the nature of Corkran's conduct.

---

[17] The parties do not address or define what constitutes a "malingering" charge. The Court understands the reference to indicate a disciplinary charge for "feign[ing] illness or disability, esp[ecially] in an attempt to avoid an obligation." *See Malinger*, Black's Law Dictionary (12th ed. 2024).

Ferguson, like Corkran, also failed firearm qualifications (doc. 37-3 at 46–47) and was involved in a City vehicle accident (*id.* at 45). Although the record evidence points to a few similarities in their disciplinary histories, it would be improper to find that Ferguson and Corkran are appropriate comparators based on two shared minor violations. First, the record does not indicate when Corkran committed several of his department violations and it fails to underscore the severity and punishment for every offense. Corkran's major offense articulated in the record occurred in the distant past. Corkran's major four-day suspension occurred "back in 2013[,]" seven years before Ferguson's termination in 2020. (Doc. 37-5 at 178:21–23). Unlike Corkran, Ferguson committed a Category B "Major Infraction" only two years before his termination. (*See* docs. 37-3 at 32–37, 38 at 3–4). Ferguson was suspended for sixteen hours for violating MPD's pursuit of motor vehicle policy—Article VII: Section 7.2.2. (Doc. 37-3 at 32).

Although Corkran and Ferguson both served suspensions, Ferguson fails to identify the similarities between their disciplinary or employment histories that make them similar in all material respects. To say otherwise, would ignore the multiple "critical differences" between them. *See Lewis I*, 918 F.3d at 1230. Ferguson served MPD for approximately fifteen years prior to his termination (doc. 37-3 at 7–47), and Corkran served twenty-two years (doc. 37-5 at 178:11). The record is devoid of any timeline associated with Corkran's misconduct. Ferguson was disciplined for a Category B "Major Infraction" while serving as a Lieutenant, a position in MPD's rank and command structure. (Doc. 37-3 at 1, paras. 2, 36). There is no record evidence to suggest that Corkran violated department policies while serving in a position of authority. Perhaps most importantly, the Court cannot

compare Corkran's major violation, his four-day suspension with Ferguson's major infraction, because the record is devoid of any explanation for Corkran's four-day suspension.  Even when viewing the evidence in the light most favorable to Ferguson, he fails to demonstrate that Corkran is a valid comparator based on the record evidence regarding the parties' disciplinary histories.

At bottom, although Ferguson and Corkran failed to properly report Ferguson's use of force, the two MPD officers held different ranks, were disciplined by different decisionmakers, and only Ferguson deployed a carotid submission hold to subdue a suspect.  Thus, Ferguson and Corkran are not similarly situated in all material respects, and Ferguson's evidence regarding Corkran fails to support his prima facie case of intentional discrimination under the *McDonnell Douglas* framework.

### iv.    Major John W. Hall

Ferguson identifies Hall, a white officer, as his fourth and final comparator. Ferguson claims that Hall, his supervisor, was "investigated for misconduct and . . . received a more favorable outcome th[a]n [Ferguson]." (Doc. 40 at 7).  Ferguson alleges that Hall "was also disciplined[] and received a lower form of discipline." (Doc. 37-1 at 55:13–18).  However, the record provides little evidence to support this assertion, even when viewing the evidence in the light most favorable to Ferguson.

First, although Ferguson's deposition testimony suggests that Hall was investigated for misconduct, there is no evidence in the record from which the Court can discern the specifics thereof.  Even if Hall was investigated, Hall's own affidavit states that "City Investigations did not substantiate any charges against . . . [him] as a result of the handling

of Ferguson's chokehold." (Doc. 37-3 at 5, para. 7).  The record contains no evidence that Hall was disciplined for failure to report.  Even if Hall should have been disciplined for his failure to report, Ferguson's argument ignores the conduct which necessitated Hall's alleged duty to report—Ferguson's improper use of a carotid submission hold.  Ferguson concedes that Hall was not accused of using excessive force. (Doc. 37-1 at 56:13–15).  At bottom, Ferguson's underlying misconduct involved the improper deployment of a carotid submission hold, which differs from Ferguson's allegations regarding Hall's failure to report.  Therefore, Ferguson and Hall did not engage in the same type of misconduct.

Second, Ferguson does not argue that Hall was charged with violating the same MPD policies.  Ferguson's conduct was governed by MPD Directive 3.4.1 and the 2016 Use of Force Memorandum, whereas the record provides no evidence that Hall was charged under *any* MPD policy. *See Moore*, 137 F. App'x at 239 ("We have previously held that a difference in the charged offenses can preclude a comparison for Title VII purposes.").  Additionally, Ferguson and Hall held different ranks at the time of their alleged respective disciplinary consequences, and although the difference in rank between Ferguson and Hall is not "dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim," it is important to note that Ferguson and Hall held different ranks. *Rioux*, 520 F.3d at 1281; *c.f.*, *Anthony*, 69 F.4th at 805 (noting that two police officers were not similarly situated in all material respects, in part because they held different ranks).

Third, the record is unclear whether Hall was disciplined at all.  If he was, Ferguson does not allege who would have disciplined Hall.  The record also fails to pinpoint who

reviewed Hall's conduct or which MPD personnel decided against disciplining Hall. The record evidence does not suggest that Reed disciplined Hall. In any event, even if Reed disciplined Hall for a failure to report, the lack of other similarities would weigh against a finding that the two were similarly situated in all material respects.

Fourth, Ferguson points to no record evidence explaining Hall's disciplinary or employment history for comparison. Without record evidence of Hall's disciplinary history, the Court cannot find that Hall and Ferguson share similar disciplinary or employment histories.

Thus, Ferguson has failed to meet his burden to prove a prima facie case of intentional discrimination under *McDonnell Douglas*. The record is devoid of any information regarding Hall's alleged punishment for failure to report, his prior MPD employment history, or his disciplinary record. Even if the Court assumed that Hall failed to report Ferguson's use of force to a superior officer, Ferguson fails to show Hall engaged in a similar use of force—deploying a carotid submission hold. In fact, Ferguson concedes that Hall was not accused of excessive force. (Doc. 37-1 at 56:13–15). Thus, Ferguson's evidence regarding Hall fails to support his prima facie case of intentional discrimination under the *McDonnell Douglas* framework. Having reviewed each of Ferguson's comparators individually, the Court finds that Ferguson fails to make out a prima facie case of discrimination under Title VII.

### b.    Legitimate Nondiscriminatory Reasons

Even if Ferguson properly established a prima facie case of unlawful discrimination under *McDonnell Douglas*, he would still have to show a genuine dispute as to whether the

City's legitimate nondiscriminatory reasons for its actions are pretext for discrimination. The City provides two legitimate nondiscriminatory reasons for Ferguson's termination: (1) Ferguson violated MPD Directive 3.4.1's reporting provision and (2) Ferguson violated the 2016 Use of Force Memorandum, which satisfies the City's "exceedingly light" burden at this stage. *See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (citation omitted).    The City, through its ultimate decisionmaker, Reed, terminated Ferguson because the City "had a zero[-]tolerance policy against choking." (Doc. 37-5 at 36:8–9).    Ferguson disagrees and argues that he was terminated for violating MPD Directive 3.4.1's reporting provision. (Doc. 37-1 at 55:13–14, 56:4–8).    Ferguson also argues that the City's stated reason that he was fired "over this memo"[18] was improper because the 2016 Use of Force Memorandum "was not the governing policy in which [he] was acting under." (Doc. 37-5 at 271:1–3).    Under either rationale for his termination, the burden shifts to Ferguson to show "not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023).

### i.    Pretext

Because the City offered legitimate nondiscriminatory reasons for Ferguson's termination, it is his burden to "cast sufficient doubt on [the City's] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [they] were not what actually motivated its conduct." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1323–

---

[18] Ferguson's testimony is unclear which "memo" he is referring to.  The Court assumes without deciding that Ferguson's testimony references the 2016 Use of Force Memorandum which cautioned against the use of choking. (*See* doc. 37-1 at 141).

24 (11th Cir. 2023) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  The Court's inquiry into pretext "centers on the employer's beliefs about the employee's conduct, not the employee's beliefs about [his] own actions." *Id.* at 1324 (internal quotation marks omitted).  Ferguson can establish pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [City's] proffered legitimate reasons for its action [such] that a reasonable factfinder could find them unworthy of credence." *Id.* (quoting *Combs*, 106 F.3d at 1538).

Viewing the evidence in the light most favorable to Ferguson, he has failed to show that the City's legitimate reasons for terminating him were pretextual and motivated by discrimination.  Ferguson argues that the 2016 Use of Force Memorandum, which barred the use of "choking[,]" was no longer in effect during the June 30, 2020 incident. (Doc. 37-5 at 237:13–239:6).  Ferguson also contends that supervisors and other similarly situated employees were treated more favorably. *See supra* Section V.A.1.a.i–iv.  Ferguson argues that he was not required to fill out a Defensive Action Form following his deployment of the carotid submission hold. (Doc. 37-1 at 57:22–58:11).  Ferguson subsequently states that Reaves "skipped over steps in order to recommend a 20-day suspension." (Doc. 37-5 at 270:17–21).

Although Ferguson contends that the 2016 Use of Force Memorandum was no longer in effect and argues he was not required to submit a Defensive Action Form under MPD Directive 3.4.1, he fails to demonstrate inconsistencies in the City's proffered legitimate reasons for his termination.  Because the pretext inquiry focuses on the City's beliefs about Ferguson's conduct—even if Reed mistakenly believed that the 2016 Use of

24

Force Memorandum operated in full force on June 30, 2020—Ferguson would still fail to show pretext. Ferguson must show that the "real reason" for his termination was discrimination. *See Tynes,* 88 F.4th at 944. Even assuming Ferguson's actions were consistent with MPD policy—that would only establish that Reed misunderstood MPD policy. "[A]n employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001). The City is free "to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Phillips*, 87 F.4th at 1325 (quoting *Flowers v. Troup Cnty., Ga., Sch. Distr.*, 803 F.3d 1327, 1338 (11th Cir. 2015)).

Furthermore, Ferguson's conduct was reviewed by several parties including City Investigations, Reaves, Finley, Judge Price, and Reed. Each party evaluated the June 30, 2020 incident and determined that Ferguson's conduct warranted disciplinary action. The parties simply disagreed on Ferguson's ultimate punishment. The record, including Ferguson's disciplinary process, does not support any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered legitimate reasons for Ferguson's termination. *Id.* at 1324. Therefore, Ferguson has failed to establish that the City's proffered legitimate reasons for his dismissal—deploying a carotid submission hold and failing to report—are pretext for discrimination.

### 2.    Convincing Mosaic Analysis

Although Ferguson fails to satisfy the elements of a prima facie case under the *McDonnell Douglas* framework, he may still be able to prove his case with a "convincing

mosaic of circumstantial evidence that would allow a reasonable jury to infer or find intentional racial discrimination in an adverse employment action." *Poer*, 100 F.4th at 1336–37.  Ferguson may establish a convincing mosaic by evidence that demonstrates, among other things, "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the [City's] justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (internal quotation marks and citation omitted).

The totality of Ferguson's arguable circumstantial evidence which may support an inference of intentional discrimination based on his race is as follows:  (1) deposition testimony that Hall and Corkran received lower forms of discipline (doc. 37-1 at 55:13–18); (2) comparator evidence addressed in Section V.A.1.a.i–iv; (3) Reaves' general dislike for Ferguson (*id.* at 87:12–88:7); (4) MPD's investigation regarding allegations that MPD officers were employed as off-duty police officers without approval (*see* doc. 37-2 at 2); and (5) MPD's alleged policy change regarding use of force following Ferguson's termination (doc. 37-5 at 271:6–23).

First, the Court addresses two of the three types of evidence discussed in *Lewis II*: better treatment of similarly situated employees and whether the City's justification is pretextual. *Lewis II*, 934 F.3d at 1185.  Even when viewing Ferguson's deposition testimony in the light most favorable to Ferguson, the Court repeats its finding that he failed to show that similarly situated employees, including Hall and Corkran, were treated more favorably than he was.  In addition, the Court finds, even when viewing the evidence

in the light most favorable to Ferguson, that he failed to show the City's justification for his termination—violations of the 2016 Use of Force Memorandum and MPD Directive 3.4.1—was pretextual. *See supra* Section V.A.1.b.i.

The Court focuses the remainder of its analysis on whether Ferguson has demonstrated "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn" by analyzing Reaves' general dislike for Ferguson, MPD's investigation into unauthorized off-duty police work, and MPD's alleged policy change regarding the use of force following Ferguson's termination. *See Lewis II*, 934 F.3d at 1185.

Ferguson alleges that Reaves "started everything" which eventually led to his termination. (Doc. 37-1 at 71:19). Ferguson claims that Reaves "developed an unlikeness" toward him and noted the two "had several disagreements, [which] include[d] at the fair, whether we w[ere] on . . . different teams and duties that we had that w[ere] bumping heads with each other . . . she . . . strongly disliked me." (*Id.* at 87:9–88:3). Ferguson also claims that Reaves "skipped over steps in order to recommend a 20-day suspension." (Doc. 37-5 at 270:17–21). Ferguson believes that Reaves' feelings were motivated in "part" because of his race. (Doc. 37-1 at 88:4–7).

Ferguson's evidence focuses on Reaves' alleged conduct. Ferguson asserts that Reaves' conduct was motivated in part because of his race. Even assuming that Reaves' conduct was motivated by her personal dislike of Ferguson that would not demonstrate that Ferguson was fired because of his race. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 986 (11th Cir. 1989) ("a dislike alone is not evidence of racial discrimination"). Reaves did

not fire Ferguson—Reed did.  In fact, Reaves recommended that Ferguson only serve a twenty-working day suspension, a lesser punishment than Reed's ultimate decision to terminate Ferguson.    Reed rejected various recommendations and independently determined that Ferguson should be terminated.  To impute Reaves' alleged bias to Reed, Ferguson would need to allege that Reaves' discriminatory conduct and suspension recommendation caused Ferguson's termination.  Ferguson would need to show "the decisionmaker [Reed] followed [Reaves'] biased recommendation without independently investigating the complaint against [Ferguson]." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).  Ferguson alleges that Reed terminated him "without review of any of the evidence." (Doc. 1 at 6, para. 33).

Tellingly, Ferguson does not explicitly advance this argument.  To the extent Ferguson makes this hidden "cat's paw" theory of liability argument—that Reed endorsed Reaves' biased recommendation without independently reviewing Ferguson's conduct— this is a nonstarter.  First, Reed did not "rubber stamp" Reaves allegedly biased recommendation—he overruled her recommendation implicitly by terminating Ferguson. *See Stimpson*, 186 F.3d at 1332.  Furthermore, Reed noted at Ferguson's personnel board hearing that even if he only reviewed the video from the June 30, 2020 carotid submission hold, he would have terminated Ferguson. (Doc. 37-5 at 36:1–5).  Based on the record, even when viewing the evidence in the light most favorable to Ferguson, the Court cannot infer discriminatory intent based on Reaves' conduct.

Ferguson was investigated, along with twelve[19] other police officers, regarding allegations that they "were employed as off-duty police officers without the sanction of the [MPD] and without completing off-duty employment requests for each employment, which result[ed] in each officer receiving monies for personal gain." (Doc. 37-2 at 2).

Ferguson alleges that because Reaves "was already investigating Ferguson and [eleven] other African American employees of [MPD] [that Reaves' conduct] is suspect and gives rise to an inference of race discrimination." (Doc. 40 at 2). To be clear, an investigation into Ferguson's conduct would not qualify as an adverse employment action. *See Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020) ("an internal investigation—like any alleged adverse employment action—is not sufficient to state a discrimination claim if it did not cause him any . . . negative job consequences")). Putting aside whether the investigation would be an adverse employment action, even viewing the evidence in the light most favorable to Ferguson, he fails to tie these allegations to his termination. The Court is tasked with determining whether Ferguson presented enough "circumstantial evidence that would allow a reasonable jury to infer or find intentional racial discrimination in an *adverse employment action*." *Poer*, 100 F.4th at 1337. Ferguson's adverse employment action—his termination—is unrelated to an investigation into off-duty MPD officers receiving improper benefits.

The investigation into off-duty MPD officers began on October 2, 2020 and Ferguson became aware of the investigation on October 3, 2020. (*See* docs. 37-2 at 2, 37-

---

[19] The City provides record evidence that "[t]hirteen individuals were investigated [by City Investigations] . . . [t]welve (12) black males and one (1) white male." (Doc. 37-2 at 2).

3 at 20).  Ferguson was fired only seventeen days later on October 20, 2020. (Doc. 37-3 at 8).  Even though there is temporal proximity between the investigation into off-duty MPD officers and Ferguson's termination—a reasonably jury would be unable to infer or find racial discrimination.  Ferguson fails to show how the investigation's timing demonstrates an inference of racial discrimination tied to the City's ultimate decisionmaker—Reed. Ferguson's failure to show an inference of racial discrimination is buttressed by his own testimony that he was terminated before the investigation regarding off-duty MPD officers was completed and before any charges were brought against him. (Doc. 37-1 at 122:9–14). Ferguson alleges that Reaves investigated the allegations into the off-duty police officers. (Doc. 40 at 2).  Ferguson further states that "a reasonable jury could conclude that *Reaves* discriminates in who she decides to investigate for misconduct." (*Id.* at 2) (emphasis added).  Even if Reaves' conduct was indeed "suspect" and improper—Ferguson must present evidence that shows Reed acted in such a way that an inference of discriminatory intent may be found.  Again, Reaves did not terminate Ferguson—Reed did.  Even viewing the evidence in the light most favorable to Ferguson, there is no record evidence to suggest that Reed would have been aware of any investigation into Ferguson regarding off-duty employment prior to his decision to terminate Ferguson.

Ferguson points to no record evidence that Reaves spearheaded the investigation or suggested that Reed review the allegations.  Ferguson does not reference any evidence that the investigation into off-duty MPD officers was finalized before Ferguson's termination— in fact he concedes the opposite. (Doc. 37-1 at 122:9–14).  There is no evidence that Reaves' "suspect" motives were shared by Reed.  Similarly, the record is devoid of

evidence that Reed participated in the investigation—period.  Ferguson points to no other record evidence from which the Court—or a reasonable jury could discern an inference of discriminatory intent regarding the investigation into Ferguson's off-duty employment.

Finally, Ferguson alleges that discriminatory intent can be inferred from MPD's alleged decision to change the use of force policy following his termination.  Ferguson testified that thirty-seven "days after my incident, [MPD] actually came out with another policy . . . to clarify and specify that . . . no choking [was] allowed for the [MPD]." (Doc. 37-5 at 271:6–23).  The record does not contain a copy of the alleged updated policy. Although this Court must view the evidence in the light most favorable to Ferguson, "inferences in favor of [Ferguson] can be based only on evidence—not on speculation." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) (quoting *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020)).  Additionally, this Court must evaluate Ferguson's Title VII claims based on "the employer's beliefs' about the employee's conduct, not the employee's beliefs" about whether his actions were permissible. *Phillips*, 87 F.4th at 1324 (citation and internal quotation marks omitted). Without more, Ferguson does not meet his burden to show a convincing mosaic of evidence based on mere speculation that the policy changed because of an improper motive.

The totality of Ferguson's circumstantial evidence, even when viewed in the light most favorable to him, does not support an inference that the City intentionally discriminated against him because of his race.  Therefore, because Ferguson failed to establish a prima facie case of discrimination under *McDonnell Douglas*, or a convincing mosaic of circumstantial evidence to allow a reasonable jury to find unlawful

discrimination, the City's motion for summary judgment is due to be GRANTED on Ferguson's discrimination claim.

### B.    Unlawful Retaliation

The Court now turns to Ferguson's claim that the City unlawfully retaliated against him after engaging in protected activity, in violation of Title VII.  Ferguson provides no direct evidence of the City's retaliatory intent.  Thus, Ferguson can survive summary judgment by making a prima facie case of unlawful retaliation under the *McDonnell Douglas* framework or by showing a convincing mosaic of evidence to allow a reasonable jury to find unlawful retaliation.

### 1.    *McDonell Douglas* Analysis

Title VII makes it unlawful for an employer to retaliate "against any of his employees . . . because [the employee] has opposed any [unlawful employment] practice" or because of the employee's participation in a Title VII investigation or hearing. 42 U.S.C. § 2000e-3; *see also Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344, 1350 (11th Cir. 2022). When a Title VII retaliation claim (such as Ferguson's) does not present direct evidence of retaliation but instead relies on circumstantial evidence, this Court applies the three-part, *McDonnell Douglas* burden-shifting framework. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020); *see also McDonnell Douglas Corp.*, 411 U.S. at 802.

To establish a prima facie case of unlawful retaliation under Title VII, Ferguson must demonstrate that:  (1) he was engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between his protected activity

and the adverse employment action. *See Fucron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016) (citations omitted). The burden then shifts to the employer to articulate legitimate reasons for the adverse employment action "to negate the inference of retaliation." *Id.* Assuming the employer offers a legitimate reason for the adverse employment action, the "burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the 'legitimate' reason is merely pretext for prohibited, retaliatory conduct." *Lapham v. Walgreen Co.*, 88 F.4th 879, 889 (11th Cir. 2023) (quoting *McAlpin v. Sneads*, 61 F.4th 916, 927 (11th Cir. 2023)). Ferguson bears the "ultimate burden of persuasion." *Id.*

Ferguson argues that he engaged in three types of statutorily protected activities: (1) filing a charge of discrimination with the EEOC; (2) filing a workplace harassment complaint; and (3) informally complaining that Reaves investigated him because of his race.[20] The Court will assume without deciding that all three activities qualify as protected activity.[21] Additionally, because the parties do not contest that Ferguson suffered an adverse employment action—his termination—only the causal link element is in dispute.

---

[20] The record evidence does not explain if Ferguson's statement that he "made it clear that he felt Reaves was targeting him for investigations" was encompassed by his workplace harassment complaint. (Doc. 40 at 3, 9). For purposes of this Opinion, the Court will analyze Ferguson's allegation that he voiced concerns regarding Reaves' conduct, as separate and apart from the workplace harassment complaint. This does not affect the Court's ruling, as under either analysis Ferguson fails to demonstrate the requisite causal connection between his protected activity and his termination.

[21] The City's motion for summary judgment "assum[es] for purpose of argument that [Ferguson's activities constitute] protected conduct." (Doc. 38 at 26). The City contends "there is no causal connection" between Ferguson's purported protected activities and his termination. (*See id.*). Ferguson "disputes that he did not engage in protected conduct prior to Reaves conducting investigations on him." (Doc. 40 at 3).

The Court will now analyze whether a causal link exists between each protected activity and his termination.

### a.    Causal Connection

To establish a causal connection between Ferguson's termination and his protected activity, he must show "the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (citation and internal quotation marks omitted).  Ferguson can show "the two events are not wholly unrelated if [he] shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)).  If the protected conduct and adverse employment action occur in close temporal proximity, courts generally find that the plaintiff provides "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Id.* (citation omitted).  However, "mere temporal proximity without more, must be 'very close'" to support a prima facie case of retaliation under *McDonnell Douglas*. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citation omitted).

Ferguson must establish a sufficient causal connection between each protected activity and his termination.  The Court begins its analysis with Ferguson's filing of a charge of discrimination with the EEOC.

### i.    EEOC Charge of Discrimination

Ferguson alleges that he was retaliated against because he filed a charge of discrimination with the EEOC. (Doc. 1 at 5, para. 24).  However, the City could not have retaliated against Ferguson for filing an EEOC charge because he was no longer an employee.   Reed terminated Ferguson in October 2020—nearly six months before Ferguson filed the EEOC charge of discrimination.  Thus, Ferguson's protected activity occurred *after* his MPD employment ended.  Accordingly, Reed's decision to terminate Ferguson could not have been based on Ferguson's EEOC charge of discrimination. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (protected activity that occurred after termination could not have motivated discharge). Ferguson does not establish the requisite causal connection between his termination and his EEOC charge of discrimination.  Therefore, Ferguson's EEOC charge of discrimination fails to support his prima facie case of retaliation against the City.

### ii.    Workplace Harassment Complaint

Ferguson alleges that he was retaliated against for "fil[ing] a harassment workplace [sic] on Chief Reaves." (Doc. 37-1 at 72:19–22).  Ferguson filed the workplace harassment complaint in September 2020, prior to his termination.[22]   Ferguson must establish a

---

[22]  During Ferguson's deposition, he alleged that he filed the workplace harassment claim on September 25, 2020, prior to his October 2020 termination. (Doc. 37-1 at 73:4–5).  Steven Hudson, a member of City Investigations stated that Ferguson filed a complaint against Reaves on September 30, 2020. (Doc. 37-2 at 2).  Because both alleged dates occurred prior to his termination, the purported five-day distinction does not impact the Court's analysis.  The Court will assume without deciding for purposes of this Opinion that Ferguson filed his complaint against Reaves on September 30, 2020.

sufficient causal link between his protected activity—filing a workplace harassment complaint and his adverse employment action—his termination.[23]

Ferguson fails to establish the requisite causal connection between his termination and his workplace harassment complaint. Ferguson filed the workplace harassment complaint in September 2020, prior to his termination in October 2020. Ferguson argues that this one-month gap between his workplace harassment complaint against Reaves and his termination demonstrates that the two events were not wholly unrelated and sufficiently establish a causal connection. (Doc. 40 at 9). Ferguson is partially correct—the one-month period between his filing of a workplace harassment complaint and his termination is not "too protracted" to potentially support the causal connection element of his prima facie case. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) ("A period as much as one month between the protected activity and the adverse action is not too protracted."). However, Ferguson's argument skips a crucial step, he must provide

---

[23] In Ferguson's summary judgment response, he identifies his termination as the sole adverse employment action at issue. (Doc. 40 at 7). However, during Ferguson's deposition, he alleged that Reaves "retaliat[ed] against [him], personally" and "started everything" by making a disciplinary recommendation regarding his June 30, 2020 conduct. (Doc. 37-1 at 71:11–72:3). Reaves did not terminate Ferguson, instead she recommended that Ferguson serve a twenty-calendar day suspension without pay. (Doc. 37-3 at 12, 18). To the extent Ferguson argues that Reaves' suspension recommendation constitutes an adverse employment action—Ferguson is misguided. Adverse employment actions include actions that "affect continued employment or pay—things like terminations, demotions, [and] suspensions without pay." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020)). Here, Reaves merely *recommended* Ferguson serve a twenty-calendar day suspension without pay—less than his ultimate punishment—termination. Even if Reaves' recommended suspension constituted an adverse employment action, Ferguson would fail to causally link his workplace harassment claim to Reaves' recommended suspension. Reaves recommended Ferguson's suspension on August 11, 2020, one month before Ferguson filed his workplace harassment claim in September 2020. Thus, Ferguson's purported protected activity occurred *after* Reaves' decision to recommend a twenty-calendar day suspension. *See Johnson*, 234 F.3d at 507 (protected activity that occurred after termination could not have motivated discharge). Because Ferguson's alleged protected activity occurred after Reaves' decision to recommend a suspension, he has not established that the two events are causally connected.

36

sufficient evidence that Reed became aware that Ferguson filed a workplace harassment claim *and* that there was a close temporal proximity between this awareness and the adverse action. *See Martin*, 959 F.3d at 1053–54 (explaining "a decision maker cannot have been motivated to retaliate by something unknown to him, whether or not the two events happened close in time.") (internal quotation marks and citation omitted); *see also Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1336 (11th Cir. 2021) (analyzing a Florida Civil Rights Act retaliation claim noting "[a] plaintiff makes this showing if she provides sufficient evidence that the decisionmaker became aware of the protected conduct and that there was a close temporal proximity between this awareness and the adverse action."). Indeed, on this record, there is no evidence that the relevant decisionmaker, Reed, knew of Ferguson's protected activity so his termination was not retaliation for it. *Matamoros*, 2 F.4th at 1337.

Because Ferguson fails to provide record evidence that Reed was aware of his workplace harassment complaint prior to his decision to terminate him, Ferguson fails to show the two events were casually connected. Therefore, Ferguson fails to support his prima facie retaliation claim regarding his workplace harassment complaint.

### iii. Informal Complaint Against Reaves

Finally, Ferguson alleges that he was retaliated against "after [Ferguson] *made it clear* that he felt that Reaves was targeting him for investigations due to his race." (Doc. 40 at 3, 9) (emphasis added). Although Ferguson does not elaborate—the Court surmises that Ferguson contends he informed Reed that Reaves was targeting him for investigations.

Ferguson must establish a sufficient causal link between his protected activity—levying an informal complaint against Reaves and his adverse employment action—his termination.

Under *McDonnell Douglas*' burden-shifting framework, Ferguson bears the burden to establish the causal link element of a prima facie retaliation claim that Reed was aware of Ferguson's informal complaints before his decision to terminate Ferguson. Ferguson fails to meet his burden.

Ferguson points to no record evidence that Reed was informed by Ferguson, or anyone else, that Reaves targeted him for investigations. The totality of Ferguson's evidence in support of his claim that Reed was aware that Reaves targeted Ferguson is contained within his summary judgment response. Therein, Ferguson alleged that he was terminated "after [he] made it clear that he felt that Reaves was targeting him for investigations due to his race." (*Id.*). Ferguson did not testify during his deposition that he or anyone else informed Reed that Reaves targeted him for investigations. *See generally* (doc. 37-1).

Contrastingly, the City proffers evidence that Reed was unaware of Ferguson's relationship with Reaves. When asked during his deposition whether "Re[a]ves brought attention to Ferguson because of his race? [Reed responded] "No, I never heard that."[24] (Doc. 37-4 at 55:1–3). Later, Reed was asked if he knew "of any animosity that Re[a]ves has against Antavione Ferguson[,]" Reed replied, "[n]o, I do not." (*Id.* at 55:4–6). Tellingly, Reed testified that he "d[id not] recall talking to Re[a]ves" regarding Ferguson's

---

[24] Reed's deposition transcript incorrectly spells Reaves' name as "Reeves." (*See, e.g.*, doc. 37-4 at 55:1–6).

case. (*Id.* at 54:5–7).  Specifically, Ferguson has not shown that Reed was aware of any complaints regarding Reaves.  Ferguson does not allege when Reed was informed, how Reed was informed, or by what means Reed was informed of any complaints regarding Reaves.  Even presuming a close temporal proximity between Ferguson's complaints regarding Reaves and his termination, Ferguson would still be unable to avoid summary judgment because a "decision maker cannot have been motivated to retaliate by something unknown to him." *Martin v*, 959 F.3d at 1054 (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).  Ferguson fails to establish a sufficient causal connection between his termination and his (1) EEOC charge of discrimination; (2) workplace harassment complaint; or (3) informal complaint against Reaves.  Therefore, Ferguson has failed to support a prima facie case of retaliation under the *McDonnell Douglas* framework.[25]

## 2.    Convincing Mosaic Analysis

The *McDonnell Douglas* framework is not the only way to prove retaliation; instead, Ferguson may prove retaliation with "any circumstantial evidence that creates a reasonable inference of retaliatory intent[,]" sometimes referred to as a "convincing mosaic." *Berry*, 84 F.4th at 1310–11.  Much like the Court's previous convincing mosaic analysis regarding Ferguson's unlawful discrimination claim in Section V.A.2, the Court may consider "evidence of suspicious timing, ambiguous statements, or other information from which

---

[25] Because the Court finds that Ferguson failed to establish a causal connection between his protected activity and his termination, the Court pretermits discussion regarding whether the City provided legitimate reasons to negate an inference of retaliation.

unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Id.* at 1311.

The entirety of Ferguson's summary judgment briefing contains one specific allegation regarding retaliation—that Ferguson "was fired by Reed . . . after [Ferguson] made it clear that he felt that Reaves was targeting him for investigations due to his race." (Doc. 40 at 3, 9). Ferguson is not "limited in the kinds of circumstantial evidence [he] may present." *Berry*, 84 F.4th at 1311. The Court should evaluate Ferguson's circumstantial evidence, "no matter how [Ferguson] present[ed] [it]" and determine "whether the evidence permits a reasonable factfinder to find that the [City] retaliated against [Ferguson]." *Id.* The Court will now evaluate Ferguson's circumstantial evidence with an eye toward inferences of retaliation.

As previously discussed in the context of Ferguson's unlawful discrimination claim—Ferguson fails to rebut the legitimate reasons for his termination. *See supra* Section V.A.1.b. Ferguson's summary judgment response (doc. 40) does not provide any analysis that the legitimate reasons for his termination are pretext. Ferguson does not rebut the City and fails to address the City's proffered reasons "head on." *Berry*, 84 F.4th at 1308–09 (citing *Patterson*, 38 F.4th at 1352). Thus, Ferguson fails to "prove that the [City's] reason[s] 'w[ere] false' and that 'retaliation was the real reason.'" *Id.* at 1308 (citing *Patterson*, 38 F.4th at 1352).

Ferguson failed to specifically reference circumstantial evidence regarding his retaliation claims, so the Court is left to borrow from its own convincing mosaic analysis

on the discrimination claim.  The record contains three pieces of evidence from which Ferguson could potentially craft a convincing mosaic:  (1) Reaves' general dislike for Ferguson (doc. 37-1 at 87:12–88:7); (2) MPD's investigation regarding allegations that MPD officers were employed as off-duty police officers without approval (*see* doc. 37-2 at 2); and (3) MPD's alleged policy change regarding use of force following Ferguson's termination (doc. 37-5 at 271:6–23).

The Court reiterates its finding that Ferguson failed to provide evidence sufficient to show that Reaves' alleged bias was imputed to Reed, such that Reed was made aware and endorsed Reaves' alleged improper motives.  Ferguson failed to show that the MPD investigation into off-duty police officers evidenced retaliation, as Ferguson presented no evidence that Reed was aware of the investigation or that it affected his disciplinary proceedings.  Ferguson did not point to record evidence to suggest that the City's ultimate decisionmaker, Reed, was aware of the investigation prior to his termination.  Ferguson himself concedes that he was terminated prior to the investigation's completion. (Doc. 37-1 at 122:9–14).  Finally, any alleged change in the MPD use of force policy following Ferguson's termination is speculative at best.

At bottom, Ferguson's claim of unlawful retaliation meets the same fate as his unlawful discrimination claim.  The circumstantial evidence cited by Ferguson—viewed in the light most favorable to him—does not create a reasonable inference of intentional retaliation.  Therefore, because Ferguson failed to establish a prima facie case of retaliation under *McDonnell Douglas*, or a convincing mosaic of circumstantial evidence to allow a

reasonable jury to find unlawful retaliation, the City's motion for summary judgment is due to be GRANTED on Ferguson's retaliation claim.

## VI.  CONCLUSION

For the reasons stated, it is

ORDERED that the City's motion for summary judgment (doc. 36) is GRANTED.

A separate and final judgment will be entered.

DONE this 10th day of December, 2024.

                    /s/ Emily C. Marks
                    EMILY C. MARKS
                    CHIEF UNITED STATES DISTRICT JUDGE